UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Stephanie Leigh Sampson, | ) | Civil Action No. 5:13-733-KDW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"),

denying her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act

("the Act"). Having carefully considered the parties' submissions and the applicable law, the

court affirms the Commissioner's decision, as discussed herein.

I.      Relevant Background

        A.      Procedural History

        On October 15, 2010, Plaintiff filed an application for DIB under Title II of the Act, 42

U.S.C. §§ 401-433, alleging a disability onset date of July 10, 2010. Tr. 143-44. After being

denied both initially and on reconsideration, Tr. 127-30, on November 8, 2011, Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 125.  The ALJ conducted a

hearing on October 24, 2012, taking testimony from Plaintiff and a Vocational Expert ("VE").

Tr. 40-92. The ALJ issued an unfavorable decision on December 17, 2012. Tr. 21-33. On

January 30, 2013, Plaintiff requested Appeals Council review of the decision, Tr. 6-11, but the

Appeals Council declined, Tr. 1-5, making the ALJ's decision the Commissioner's final decision

for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on March 20, 2013. ECF No. 1.

B.     Plaintiff's Background

Born in 1973, Plaintiff was 39 years old at the time of the October 24, 2012 hearing before the ALJ. Tr. 45, 143. Plaintiff graduated from high school and completed two years of college. Tr. 45, 179. Plaintiff has past relevant work ("PRW") as a grocery store price integrity coordinator and as a fast-food restaurant cashier. Tr. 161, 179. Her last day of work was July 10, 2010, which is also her alleged onset-of-disability date. Tr. 178. Plaintiff alleges she is unable to work because of her medical conditions of aortic valve replacement, meralgia paresthetica[1] (knees to hips in both legs), and depression. *Id.*

C.     The Administrative Proceedings

1.     Plaintiff's Testimony

Plaintiff testified that she was married and lived in a house with her husband and five-year-old daughter. Tr. 44-45. Their sole source of income is from her husband's job. Tr. 45. Plaintiff testified that she is five feet, four inches tall and weighed 295 pounds, which was her normal weight. Tr. 46. Plaintiff stated that she had a driver's license and was able to drive to doctors' appointments, to her daughter's school, and to the grocery store. Tr. 47.

---

[1] Meralgia paresthetica is a condition characterized by tingling, numbness, and burning pain in the outer thigh. The cause of meralgia paresthetica is compression of the nerve that supplies sensation to the skin surface of the thigh. Tight clothing, obesity or weight gain, and pregnancy are common causes of meralgia paresthetica. However, meralgia paresthetica can also be due to local trauma or a disease, such as diabetes. In most cases, meralgia paresthetica can be relieved with conservative measures, such as wearing looser clothing. In severe cases, treatment may include medications to relieve discomfort or, rarely, surgery. *See* http://www.mayoclinic.org/ diseases-conditions/meralgia-paresthetica/basics/definition/con-20030852 (last visited July 17, 2014).

2

Plaintiff testified that she started working at Bi-Lo grocery store in 1991, and her last position with Bi-Lo was as a scan coordinator, which involved scanning and changing price tags. Tr. 49-50. Plaintiff testified that as a scan coordinator she was "constantly" on her feet, she had "prolonged" sitting of one hour, and she might have to lift up to 20 pounds. Tr. 51-52.

Plaintiff testified that her worst problem was numbness in both legs from her knees to her hips. Tr. 53. She also stated her lower back hurt. *Id.* Plaintiff testified that the problems with her legs started in 2007 after hysterectomy surgery. *Id.* Doctors told her to see a chiropractor for a possible pinched nerve, and Plaintiff testified that it got "a little better, and then [she] had a car wreck in November of '08, and it's not been the same since." Tr. 54. Plaintiff stated she continues to see a chiropractor, but she is not getting any better. *Id.* Plaintiff testified that on an average day her pain level was at eight on a scale of zero-to-ten. *Id.* Plaintiff stated that her pain was aggravated by constant walking, standing, or moving. Tr. 55. Plaintiff stated that to relieve the pain she takes medication,[2] reclines with her legs elevated, and uses heating pads. *Id.* Plaintiff stated she can sit upright for about 15 minutes, and walk for about 10 minutes before it becomes too painful. Tr. 55-56. Plaintiff stated that she could stand still for 15 minutes. Tr. 56. Plaintiff testified that she has gained weight since her heart surgery because she is unable to exercise without excessive pain and weight gain is a side effect of some of her medications. Tr. 57-58.

Plaintiff testified that her husband does most of the cooking and that she spends most of her day in her recliner with her legs elevated. Tr. 60-61. Plaintiff stated that she does "minimum housework" and does not sweep, vacuum, mop, or do yard work. Tr. 61. Plaintiff testified she is

---

[2] Plaintiff testified that she was switched from Lortab to Norco because of the amount of Tylenol contained in Lortab and its effect on her enzyme levels. Tr. 56-57.

able to take care of her personal needs of bathing and dressing. Tr. 62. Plaintiff stated that although she wears a CPAP machine at night, she is unable to sleep because of the pain in her legs. *Id.* She "might" take a nap in the morning after her daughter leaves because the Norco makes her "groggy." *Id.*

Plaintiff testified that she attends the church is across the street from her house twice a week. Tr. 63-64. Plaintiff stated that since she stopped working she went on a family trip to Disney, but they stopped every hour on the way so she "could get out and move around." Tr. 64. Plaintiff testified that they did not go to the parks, and she stayed in the room unless they went out to eat. Tr. 64-65. Plaintiff testified that she also went on a Disney cruise to the Caribbean and "towards the end [she] stayed in the room the whole time." Tr. 66, 81.

Plaintiff testified that she has recovered from her heart issues, but takes metoprolol twice a day to regulate her heart rate. Tr. 67. She stated that she still has some problems breathing so she can't walk and go up and down stairs. *Id.* She also testified that her legs hurt when she climbs stairs and she has to "make sure that there's a handle or something that I can hold on to so that I don't fall off from losing my balance from it." Tr. 68. Plaintiff stated that because of the nerve pain in her legs she is unable to squat or crouch. *Id.*

Plaintiff testified that she sees a psychiatrist and psychologist for her emotional problems, and she has good days and bad days but tries to keep her spirits up for her daughter's sake. Tr. 70. Plaintiff testified that she is in a pain management program and the medication has alleviated the pain in her back and legs some, but not completely. Tr. 72.

Plaintiff testified that she has a laptop computer that she uses for about 15 minutes to check her emails. Tr. 72-73. She also watches television and listens to music, but does not read

much because she "can't concentrate." Tr. 73. Plaintiff testified that if she could work she "would definitely work." *Id.*

In response to questions from the ALJ, Plaintiff testified that she usually gets up in the morning around 7:00 to make sure her daughter is dressed for school. Tr. 75. Her husband takes their daughter to school and picks her up two days a week; Plaintiff picks her daughter up from school three days a week. Tr. 75-76. Plaintiff stated that she watches television about four hours a day. Tr. 76. She stated that usually her husband does the grocery shopping, but she will shop if she needs something. *Id.* Plaintiff stated that she does not use an assistive device but she had "looked at getting a cane." Tr. 77.

### 2. VE Testimony

Dr. Benson Hecker testified as VE that, according to the Dictionary of Occupational Titles ("DOT"), Plaintiff's prior work at Bi-Lo as a market pricer was light with an SVP of two and her work as inventory control clerk was light with an SVP of five. Tr. 85. VE Hecker opined that those skills would be industry-specific and therefore not transferable. *Id.*

The ALJ asked the VE to assume a hypothetical individual 39 years old, with a "high school education and slightly better, work history as documented and testified to," with the following exertional limitations: "lift, carry, push, pull 20 pounds occasionally, 10 pounds frequently; sit about six out of eight hours in a work day, stand or walk at least two out of eight hours in a work day." Tr. 85. The individual "should never climb a ladder, rope or scaffold but could occasionally perform all other postural activities." Tr. 86. The individual "should avoid concentrated exposure to extreme cold and avoid concentrated exposure to hazards such as unprotected heights and dangerous machinery." *Id.* The ALJ asked if such an individual could

5

perform Plaintiff's past work, either as she performed it or as performed in the national economy. *Id.* The VE testified that such an individual could perform the job as market pricer as defined in DOT 209.587-034, but not the inventory control work. *Id.* The VE identified additional available unskilled light work the individual could perform including: packer, DOT 753.687-038, nationally 670,0000, South Carolina 9800; assembler, DOT 706.684-022, nationally 229,000, South Carolina 2700; and grader, DOT 529.687-186, nationally 38,000, no South Carolina data. Tr. 87. The ALJ modified the hypothetical to include "some mental limitations but in spite of these she could concentrate, persist, and work at pace to do simple, routine, repetitive tasks, [ ] at SVP levels of 1 to 2, for extended periods, [ ] two-hour periods in an eight-hour day; she could interact occasionally with the public and interact appropriately with co-workers and supervisors in this type of stable routine setting." Tr. 88. The VE testified that such an individual could perform the past work of market pricer, as well as the additional jobs he identified. *Id.*

> The ALJ posed another hypothetical as follows:
>
> [A]n individual the same age, education, work experience from hypothetical 1, that [ ] this individual could lift, carry, push, pull 20 pounds occasionally, 10 pounds frequently; sit, stand or walk about six hours each in an eight-hour work day; at this time she should never climb a ladder, rope or scaffold but could frequently balance and kneel, occasionally perform all other postural activities; there'd be some environmental limitations, again she should avoid concentrated exposure to hazards, avoid concentrated exposures to extreme cold, extreme heat, and avoid concentrated exposure to humidity; and the mental limitations from hypothetical 1A.

Tr. 88. The ALJ asked if Plaintiff's past work as market pricer and the additional jobs identified by the VE would be available, and the VE responded in the affirmative. Tr. 89.

Plaintiff's attorney asked the effect on an individual's employability "if an individual is restricted to sitting less than two hours in an eight-hour day and stand, walk less than two hours in an eight-hour day . . . ." Tr. 89. The VE testified that restriction "would preclude past relevant work, it would preclude the jobs I have identified or any other work." *Id.* Plaintiff's attorney asked how it would affect the VE's answers "if the individual could lift less than 10 pounds occasionally, never more than 10 pounds." Tr. 90. The VE testified that it would reduce the ability to perform light work as it is defined as lifting 20 pounds occasionally and 10 pounds frequently, so none of the jobs would be available. *Id.* In response to Plaintiff's attorney the VE also testified that there would be no work available for an individual who expected to miss more than four days per month, or who had to elevate their legs waist high twice during the work day for 30 minutes each time. *Id.*

## II.    Discussion

### A.    The ALJ's Findings

In his December 17, 2012 decision, the ALJ made the following findings of fact and conclusions of law:

> (1)    The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.
>
> (2)    The claimant has not engaged in substantial gainful activity since July 10, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> (3)    The claimant has the following severe combination of impairments: history of atrial valve replacement, obesity, degenerative disc disease, anxiety, post traumatic stress disorder, and depression (20 CFR 404.1520(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

7

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of light work as defined in 20 CFR 404.1567(a) (lift/carry, push/pull 20 pounds occasionally, 10 pounds frequently, sit, stand, walk about 6 hours each in an eight-hour workday, never climbing ladders, ropes, or scaffolds, and occasionally balancing, stooping, kneeling, crouching and crawling. She should avoid concentrated exposure to extreme cold and hazards, such as unprotected heights and dangerous machinery. Mentally, she could concentrate, persist and work at pace to do simple, routine repetitive tasks at SVP levels 1 to 2 for extended periods of two-hours in an eight-hour workday, interact occasionally with the public, and interact appropriately with coworkers and supervisors in a stable, routine work setting.

(6)    The claimant is capable of performing past relevant work as a price coordinator. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

(7)    The claimant has not been under a disability, as defined in the Social Security Act, from July 10, 2010, through the date of this decision (20 CFR. 404.1520(f)).

Tr. 23-33.

B.    Legal Framework

1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations

promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing past relevant work ("PRW"); and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party. . . ." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate

establish his impairment is disabling at Step 3).

to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational.  *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.      Analysis

Plaintiff argues that the ALJ failed properly evaluate the opinion of her treating physicians and erred in discounting Plaintiff's credibility. Pl.'s Br. 3, ECF No. 15. The Commissioner responds that the ALJ's findings are supported by substantial evidence. Def.'s Br. 6, ECF No. 20.

1.      Treating Physicians' Opinions

Plaintiff argues the ALJ erred in discounting the "opinions of four treating providers who have all opined that [Plaintiff's] impairments severely affect her daily functioning and ability to perform work." Pl.'s Br. 5. Plaintiff cites to the opinions of "Peter L. Owens, M.D. (psychiatrist), Madora Howell, LISW-CP (counselor), Sheila A. O'Grady Irwin, M.D. (PCP), and Kenneth Marshall, M.D. (pain management)." *Id.* The court disagrees and finds the ALJ appropriately considered and reasonably discounted the opinions of these physicians.

Social Security Regulation 96-2p provides that if a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" *See also* 20 C.F.R. § 404.1527(c)(2) (providing treating

11

source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).

The Social Security Administration typically accords greater weight to the opinion of a claimant's treating medical sources, because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list:  (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c). In reviewing the ALJ's treatment of Plaintiff's treating physicians, the court is focused on whether the ALJ's opinion is supported by substantial evidence. The court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

a.    Dr. Peter L. Owens

On September 8, 2012, Dr. Owens completed a Mental Impairment Questionnaire of Plaintiff. Tr. 1102-04. In discussing the severity of Plaintiff's mental impairments at Step Three of his evaluation the ALJ analyzed Plaintiff's functional limitations and the opinion of Dr.

12

Owens in each part of the analysis. Tr. 24-27. For example, in the area of activities of daily living, the ALJ noted that "Dr. Owens reported that [Plaintiff's] degree of restriction in this area was "none-mild." Tr. 26. In the area of social functioning the ALJ noted that he had "taken into full consideration the opinion of Dr. Owens that she has marked limitation in this area but do not find it to be adequately supported by the clinical findings of record, which show no abnormalities in this area, or the other, substantial evidence of record. Dr. Owens notes her social isolation, except for church, but does not, otherwise, report any specific limitations in this area." *Id.* With regard to concentration, persistence, or pace, the ALJ found that Plaintiff had moderate difficulties and noted that Dr. Owens found Plaintiff had mild restriction in that area. *Id.* As for episodes of decompensation, the ALJ noted that he took into consideration "Dr. Owens's report that she has had one or two such episodes but [found] it to be wholly unsupported by the medical evidence of record." *Id.* The ALJ found that Plaintiff failed to satisfy the "paragraph B" criteria for mental impairments and considered Dr. Owens's opinion in evaluating whether Plaintiff met the "paragraph C" criteria. The ALJ noted:

> I have taken into full consideration the opinion of Dr. Owens that the claimant's mental impairment meets the "paragraph C" criteria but do not find it to be adequately supported by the clinical findings of record or the other, substantial evidence of record. I note that it is not even supported by his own findings, in that he reported that the claimant had had one or two episodes of decompensation, each of extended duration, on page three of his assessment and reported that she had had three such episodes during the previous year on page one of his assessment (Ex. 42F). As previously noted, the medical record does not substantiate her having had any such episodes. I have, therefore, given Dr. Owens's opinion little weight . . . .

Tr. 26-27. In considering Plaintiff's RFC the ALJ noted that he "considered the more recent opinion of [Plaintiff's] treating psychiatrist, Dr. Owens, but [did] not find it to be adequately supported by the clinical findings of record or the other substantial and credible evidence

presented from a longitudinal standpoint." Tr. 31.  The ALJ noted that Dr. Owens's progress

notes appeared "to primarily relate to [Plaintiff's] monetary problems and her concerns about her

disability hearing." *Id.* (citing to Ex. 43F, Tr. 1105-07).  The ALJ gave Dr. Owens's opinion

"little weight in assessing [Plaintiff's] mental residual functional capacity." *Id.*

 Plaintiff argues that the ALJ's dismissal of Dr. Owens's findings based on his progress

notes is questionable because the "notes are so sketchy and difficult to read." Pl.'s Br. 8.

Plaintiff further asserts the ALJ has no medical evidence to contradict the opinion of Dr. Owens.

*Id.* The Commissioner contends the ALJ was entitled to discount Dr. Owens's opinion as it was

inconsistent on its face and unsupported by the record medical evidence. Def.'s Br. 7-8.

 The court agrees that Dr. Owens's progress notes are largely illegible. However, the ALJ

did not rely solely on Dr. Owens's progress notes when discounting his opinion. As set forth

above, the ALJ found that Dr. Owens's opinion was not adequately supported by the record.

Substantial evidence supports the ALJ's assessment.

   b. Madora Howell, LISW-CP

 On July 7, 2011, licensed social worker Madora Howell completed an Attending

Physician's Statement of Disability in which she diagnosed Plaintiff with PTSD and generalized

anxiety. Tr. 1097-99. Counselor Howell opined that Plaintiff had minimal ability to influence

people in their opinions, attitudes, and judgments; express personal feelings; perform effectively

under stress; deal with people; make judgments and decisions; and perform reliably and

consistently. Tr. 1098. On July 3, 2012, Counselor Howell sent a clinical summary to Plaintiff's

attorney. Tr. 1070-71. In the summary, she indicated that she had not had any contact with

Plaintiff since March 10, 2011, and Plaintiff was seen for "a total of three sessions on 10.7.10,

11.11.10, and 3.10.11. Although individual counseling was encouraged, [Plaintiff] did not follow through with therapy." Tr. 1070.

> The ALJ considered Counselor Howell's RFC assessment and found:
>
> Ms. Howell is not an acceptable medical source of evidence listed in 20 CFR 404.1513, and her opinion does not constitute a medical opinion subject to the provisions of 20 CFR 404.1527. I have considered Ms. Howell's opinion as to the severity of the claimant's established impairments but do not find it to be adequately supported by the clinical findings of record or the preponderance of the evidence presented from a longitudinal standpoint.

Tr. 31.

Plaintiff asserts the ALJ erred in discounting the opinion of Counselor Howell because her colleague, Dr. Owens, "signif[ied] that he agrees with Ms. Howell's assessments of the claimant." Pl.'s Br. 7. The Commissioner argues that substantial evidence supports the ALJ's finding with regard to Counselor Howell's opinion. Def.'s Br. 9.

The Social Security Regulations distinguish between opinions from "acceptable medical sources" and "other sources." *See* 20 C.F.R. §§ 404.1513(d). SSR 06–03p further discusses "other sources" as including both "medical sources who are not acceptable medical sources" and "non-medical sources." 2006 WL 2329939 (Aug. 9, 2006). Only acceptable medical sources can establish the existence of a medically-determinable impairment, give medical opinions, and be considered treating sources whose opinions may be entitled to controlling weight. SSR 06–03p. Licensed clinical social workers are considered "medical sources who are not 'acceptable medical sources.'" *Id.* An ALJ is required to at least consider the opinion of such a non-acceptable medical source, especially when there is evidence in the record to suggest that the non-acceptable medical source had a lengthy relationship with the claimant and can present relevant evidence as to the claimant's impairment or ability to work. *Id.*

15

Here, the ALJ noted that Howell is not an acceptable medical source, and the record indicates lack of a lengthy relationship between Plaintiff and Howell. However, the ALJ considered her opinion, and specifically stated that he found Howell's opinion was not "adequately supported by the clinical findings of record." Tr. 31. Plaintiff's only argument in support of Howell's assessment is that Dr. Owens, who is an acceptable medical source, stated that he agreed with her opinions. *See* Tr. 1108. As noted by the Commissioner, "[a]n opinion from an unacceptable medical source is not entitled to controlling weight simply because it is co-signed by an acceptable medical source (like a doctor)." Def.'s Br. 10 (citing *Payne v. Astrue*, No. 10-1565, 2011 WL 2471288, at *4-5 (D. Conn. June 21, 2011)).

Even though he declined to adopt Counselor Howell's opinion, the ALJ considered the opinion using the same factors used to evaluate medical source opinions, such as the treatment relationship, the supportability of her opinion, and its consistency with the medical evidence. Accordingly, substantial evidence supports the ALJ's assessment of Counselor Howell's opinion.

### c.    Dr. Sheila A. O'Grady Irwin

The medical record in evidence indicates Dr. Irwin, of Internal Medicine Associates of Greenville, examined Plaintiff five times between May 11, 2011 and May 14, 2012. Tr. 871-70, 966-979. On May 11, 2011, Plaintiff presented for "follow up of multiple medical problems." Tr. 976. Plaintiff presented with aortic valve replacement, sleep apnea, depression, and hypothyroidism which were all described in severity as "stable." *Id.* She also presented with obesity, which was described in severity as "not well controlled." *Id.* Dr. Irwin's notes included the following "new" assessments: hypothyroidism, unspecified; aortic valve disorder, not otherwise specified; obstructive sleep apnea syndrome; and routine general medical examination

16

at a health care facility. Tr. 977-78. Dr. Irwin's notes also included the following "stable" assessments: dilated cardiomyopathy secondary to metabolic disorder; other malaise and fatigue; and paresthesia. Tr. 977. Plaintiff's subsequent visits to Dr. Irwin consisted of complaints related to hyperlipidemia, elevated Hb A1C,[4] hypothyroidism, menopause, and a dog bite, Tr. 974; a breast lump and depression, Tr. 970; follow-up on breast lump and a cold, Tr. 968; and follow-up on hyperlipidemia, depression, elevated Hb A1C, hypothyroidism, and cold symptoms, Tr. 966. Dr. Irwin's only mention of paresthesia in her medical notes occurred on May 11, 2011, when she noted it as "stable." Tr. 977.

On August 8, 2012, Dr. Irwin completed a two-page Physical Questionnaire of Plaintiff's limitations. Tr. 1100-01. Dr. Irwin noted Plaintiff's diagnosis of meralgia paresthetica and a "fair" prognosis. Tr. 1100. Dr. Irwin opined that during a typical workday Plaintiff's pain or other symptoms would be severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks. *Id.* She opined that, based on Plaintiff's impairments, Plaintiff could walk less than one block without rest or severe pain, could sit for 30 minutes at one time before needing to get up, could stand for 15 minutes at one time before needing to sit down or walk around, and could sit/stand/walk for fewer than two hours total in an eight-hour work day. *Id.* Dr. Irwin opined that Plaintiff could occasionally lift or carry less than ten pounds, and never lift or carry anything ten pounds or heavier. *Id.*  She also opined that Plaintiff could occasionally twist; could never stoop (bend), crouch/squat, or climb ladders; and could occasionally climb stairs. Tr. 1101. Dr. Irwin estimated that Plaintiff would likely be

---

[4] HbA1c refers to glycated hemoglobin (A1c), which identifies average plasma glucose concentration. For people with diabetes this is important as the higher the HbA1c, the greater the risk of developing diabetes-related complications. *See* http://www.diabetes.co.uk/what-is-hba1c.html (last visited Aug. 1, 2014).

absent from work more than four days per month due to her impairments or treatment, that Plaintiff's emotional factors contributed to the severity of her symptoms and functional limitations; and the psychological conditions of depression and anxiety affected Plaintiff's physical condition. *Id.* In the comments section of the questionnaire, Dr. Irwin noted that Plaintiff "also suffers from obesity, depression, sleep apnea, [and] pre-diabetes. She had aortic valve replacement [in] 2010." *Id.*

> The ALJ considered Dr. Irwin's August 2012 opinion and noted the following:
>
> I have also fully considered the assessment submitted by the claimant's internist, Dr. Irwin, which appears to be largely based upon her evaluation of the severity of the claimant's myalgia [sic] paresthetica. This is not an area in which Dr. Irwin has intervened in the claimant's course of treatment with her pain management specialists. Dr. Irwin's lack of familiarity with the claimant's chronic pain is evidenced by this diagnosis, which is not consistent with the reports of her treating specialists in pain management or the report of Dr. Korn. Dr. Irwin's assessment largely consists of marking boxes on a printed form with little or no clinical findings to support the assessment. I find Dr. Irwin's assessment to be overly sympathetic to the claimant and to be inconsistent with the other, substantial and credible evidence of record. Accordingly, I have given it little weight and have relied more heavily on the assessment of Dr. El-Ibiary for the reasons previously given.[5]

Tr. 31 (internal citation of record omitted).

---

[5] The ALJ noted that he relied on the assessment of state agency medical consultant Dr. El-Ibiary in assessing Plaintiff's exertional, postural, and environmental limitations because he found Dr. El-Ibiary's opinion "to be well supported by the clinical findings of record and the other, substantial evidence of record." Tr. 27. Dr. El-Ibiary completed a Physical Residual Functional Capacity Assessment of Plaintiff on June 7, 2011. Tr. 850-57. Based on Plaintiff's medical records, Dr. El-Ibiary found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, could stand and/or walk for at least two hours in an eight-hour workday, could sit for about six hours in an eight-hour workday, and had no push/pull limitations. Tr. 851. Dr. El-Ibiary opined that Plaintiff could occasionally climb a ramp/stairs; never climb ladder/rope/scaffolds; and could occasionally balance, stoop, kneel, crouch, and crawl. Tr. 852. He also found that Plaintiff had no manipulative, visual, or communicative limitations and no environmental limitations other than she should avoid concentrated exposure to extreme cold and hazards such as machinery or heights. Tr. 853-54.

Plaintiff argues that the ALJ seems to discount Dr. Irwin's opinion because Dr. Korn[6] dismissed Plaintiff's diagnosis of meralgia paresthetica "and consequently the ALJ dismisses entirely [Plaintiff's] diagnosis of meralgia paresthetica as well." Pl.'s Br. 6. The Commissioner counters that in addition to Dr. Korn, several of Plaintiff's other physicians noted that her symptoms were inconsistent with meralgia paresthetica, or her symptoms were stable or no longer an issue. Def.'s Br. 11. The court agrees with the ALJ's finding regarding Dr. Irwin's lack of familiarity with the treatment of Plaintiff's meralgia paresthetica. Dr. Irwin's treatment records do not indicate, as the ALJ noted, that this was "an area in which Dr. Irwin has intervened." Tr. 31. Furthermore, the ALJ noted that Dr. Irwin's assessment was "inconsistent with the other, substantial and credible evidence of record." *Id.* In making his determination, the court finds the ALJ did not err in relying on the assessment of Dr. El-Ibiary. "[I]t was within the ALJ's discretion to afford more weight to the opinions of a state agency medical consultant . . . ." *Burrell v. Colvin*, No. 0:12-cv-1082-MGL, 2013 WL 5350670, at *8 (Sept. 23, 2013) (citing *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986) (stating that the opinion of a non-examining physician can constitute substantial evidence to support the ALJ's decision); *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004) (disagreeing with argument that ALJ improperly gave more weight to residual functional capacity assessments of non-examining state agency physicians over those of examining physicians)). The court finds no error in the ALJ's decision to accord Dr. Irwin's assessment little weight.

---

[6] Larry R. Korn, D.O. examined Plaintiff on May 16, 2011. Tr. 831-34. His impression was that Plaintiff's "bilateral, anterior thigh complaints are not consistent/physiologic with the diagnosis

d.    Dr. Kenneth Marshall

From April 2010 through July 2011, Plaintiff was seen by Dr. Kenneth Marshall of Oaktree Medical Centre and Pain Management Associates in the Seneca, SC office prior to her requested transfer to the Easley office. *See* Ex. 6F, Tr. 571-76, 578-80; Ex. 8F, Tr. 615-20; Ex. 14F, Tr. 791-99; Ex. 23F, Tr. 859-70; Ex. 33F, Tr. 981-1005. On a March 31, 2011 follow-up visit Plaintiff reported no side effects from medications and complained of low-back and bilateral lower extremity pain. Tr. 991. Plaintiff also complained of right arm pain after a fall six weeks prior when she hit a piece of furniture. *Id.* Dr. Marshall outlined a treatment plan for Plaintiff that included discontinuing use of Topamax, initiating Keppra 500 mg, and providing Plaintiff with a letter stating that "due to her medical condition she could not work for 3 months." Tr. 993. Dr. Marshall noted that he "would anticipate this will be permanent, as her pain has not responded to numerous interventions." *Id.*

Plaintiff's only allegation of error with regard to Dr. Marshall is her assertion that the ALJ failed to address the opinion of Dr. Marshall. Pl.'s Br. 7. The Commissioner contends the "ALJ was not obliged to credit Dr. Marshall's opinion because it regards an ultimate issue that is reserved to the Commissioner" however, as reflected in his decision, the ALJ considered Dr. Marshall's treatment of Plaintiff.  Def.'s Br. 12-13. The court notes that the ALJ referenced Dr. Marshall's treatment records from January, April, and July 2011. *See* Tr. 28 (citing to exs. 14F and 23F).

Dr. Marshall's opinion regarding whether Plaintiff was permanently precluded from working was an issue reserved to the Commissioner. The ultimate question of whether a claimant is "disabled" under the statutory and regulatory scheme is one for Commissioner, not for medical

of meralgia parasthetica [sic]." Tr. 834.    20

sources. Determinations regarding whether a claimant is "disabled" and related legal conclusions are administrative determinations for the Commissioner and not for medical personnel. 20 C.F.R. § 404.1527(d) (noting certain opinions by medical sources—such as being "disabled" or "unable to work"—are not afforded "special significance"); SSR 96-5p (treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance). Accordingly, as set forth in the regulations, Dr. Marshall's opinion was not a "medical opinion" requiring evaluation and weight, but was an opinion on an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d) (determining that statements from a medical source that a claimant is disabled or unable to work "are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability."). As such, the ALJ was entitled to "not give any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(3).

2.     Findings Regarding Plaintiff's Credibility

Plaintiff also argues the ALJ erred by failing to make adequate credibility findings regarding Plaintiff, citing to the portion of the ALJ's decision that found Plaintiff's "statements at the hearing that she went on a Caribbean cruise and to Disney World and did essentially nothing lack believability." Pl.'s Br. 8. Plaintiff submits the "ALJ has no evidence to support his contention that her statements are not true." *Id.* at 9. The Commissioner defends the ALJ's decision, arguing it contains sufficient discussion of the credibility findings and is supported by substantial evidence. Def.'s Br. 14-16.

21

SSR 96-7p requires that, prior to considering Plaintiff's subjective complaints the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Only then is the ALJ to move to the second step: consideration of the record as a whole, including both objective and subjective evidence, to assess the claimant's credibility regarding the severity of her subjective complaints, including pain. *See* SSR 96-7p; *see also* 20 C.F.R. § 404.1529(b); *Craig v. Chater*, 76 F.3d at 591-96. The requirement of considering a claimant's subjective complaints does not mean the Commissioner must accept those complaints on their face. The ALJ may consider the claimant's credibility in light of her testimony and the record as a whole. If he rejects a claimant's testimony about a claimant's pain or physical condition, the ALJ must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs*., 898 F.2d 21, 23 (4th Cir. 1989) (*quoting Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p; *see Mickles v. Shalala*, 29 F.3d 918, 927 (4th Cir. 1994) ("Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers . . .

22

.").

Here, the court finds the ALJ's credibility analysis is supported by substantial evidence and was sufficiently specific. As an initial matter, the court notes the portion of the ALJ's decision cited by Plaintiff regarding testimony about a trip to Disney World and Caribbean cruise is not the only part of the decision addressing Plaintiff's credibility.[7] Rather, that was one of several conflicting statements noted by the ALJ. The ALJ noted that Plaintiff's symptoms appeared to be "controlled with medication and minimal medications supervision by her treating sources" which was consistent with Plaintiff's report that her medications were working well, with the minimal objective abnormalities of record, and with Plaintiff's level of activity. *Id.* The ALJ noted Plaintiff's earlier report that she did "everything for her daughter, who was four at that time, shopp[ed] once a week for up to two hours with rest periods, handl[ed] finances, [went] to a friend's house once a month, and attend[ed] church three times a week. The claimant also reported at that time that she had no problems paying attention, following instructions, or getting along with authority figures." Tr. 30 (citing to Ex. 4E, Function Report – Adult, dated Feb 28, 2011, available at Tr. 169-76). The ALJ also noted that Plaintiff's hearing testimony that she could sit for only fifteen minutes, walk for ten minutes, and stand still for fifteen minutes was inconsistent with her previous Function Report wherein she reported that she could sit for two hours and stand for one hour, and a Report of Contact when she stated "she could stand and cook dinner for thirty minutes." Tr. 30 (citing to Ex. 4E, available at Tr. 16-76; Ex. 6E, available

---

[7] Plaintiff asserts that Defendant's citation to the treatment notes of Dr. David Rogers that stated Plaintiff was seeing a chiropractor for neck pain after a ride at Disney was not explored by the ALJ and was used by Defendant to "tarnish" Plaintiff's credibility. Plaintiff argues the ALJ has a duty to explore inconsistencies and give Plaintiff the opportunity to explain. Pl.'s Resp. Br. 4, ECF No. 22. However, because the ALJ articulated other sufficient reasons for his credibility assessment, the court declines to remand for further investigation on this issue.

at Tr. 187-88). The ALJ further noted there was "no evidence of a medical impairment which would reasonably be expected to cause her to have to elevate her legs, as she testified at the hearing, or that she has been advised to do so by her treating sources. She has been advised by her treating sources to lose weight, but has not followed their advice and has, in fact, gained weight." *Id.*

The ALJ adequately considered record evidence and explained his findings in discounting Plaintiff's credibility. The ALJ noted that Plaintiff's impairments "could reasonably be expected to produce symptoms precipitated and aggravated by work activity in excess of the assessed" RFC, but Plaintiff did "not have an impairment, combination of impairments, or related symptoms which would preclude her from performing jobs within the assessed" RFC of light work. Tr. 30. Based on the ALJ's thorough review of the record as a whole, including his articulated reasons for discounting Plaintiff's claims, the court finds that substantial evidence supports the ALJ's credibility assessment. *See Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000) (noting ALJ may discount a claimant's complaints if inconsistencies are apparent in the evidence as a whole). Therefore, the court concludes the ALJ's credibility determination does not provide a basis for reversing the Commissioner's decision.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal

standard. *See Craig*, 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, it is hereby ORDERED that the Commissioner's decision be affirmed.

IT IS SO ORDERED.

August 4, 2014                                    Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge